ROBERT O. BONE

*v.*

WEST VIRGINIA DEPARTMENT OF CORRECTIONS

(No. 14391)

Decided June 26, 1979.

254

*Charles D. Bell and David B. Cross* for appellant.

*Chauncey H. Browning*, Attorney General, *Joseph C. Cometti*, and *Frances W. McCoy*, Assistant Attorney General, for appellee.

CAPLAN, CHIEF JUSTICE:

Robert O. Bone, who had served as a Correctional Officer I at the State Penitentiary for approximately two and one-half years, was discharged from such position on May 26, 1978. Upon appeal to the Civil Service Commission his dismissal was upheld in an unanimous ruling and this appeal was prosecuted.

On the evening of May 26, 1978 Robert O. Bone reported for duty at the penitentiary and was assigned to guard an inmate patient at Wheeling Park Hospital in Wheeling, West Virginia. He had formerly, on many occa-

sions, been assigned to hospital duty. However, when Mr. Bone reported to the Admissions desk on this occasion, he was informed that the inmate was in a room with another patient who was not an inmate of the prison. He did not report to his assigned duty but called the Shift Commander, Captain Campbell, related to him the situation and told him that he was not going to perform the duty to which he was assigned. He told Captain Campbell that he would not accept the responsibility of the safety of the non-inmate patient. This was the basis for his refusal to perform his duty.

The Captain told him that he did not have to assume the responsibility of the "civilian" but that his only duty was to maintain security and assume responsibility for the inmate. Mr. Bone again refused Captain Campbell's direct order to assume his duty at the hospital room. The latter then told Bone that he was coming to the hospital. Before he went he related to the Deputy Superintendent, Mr. Davis, what had transpired with Mr. Bone and Mr. Davis told him "to inform Officer Bone at that time that he was suspended from duty until he came to his office at 8:00 a.m. on Monday, May 29th."

Captain Campbell met Mr. Bone in the lobby of the hospital and for the third time the latter refused a direct order to relieve the guard in the subject hospital room. Immediately thereafter Bone returned to the penitentiary where he was discharged by Deputy Superintendent Davis.

On May 29, 1978, Bobby J. Leverette, the Superintendent of the penitentiary, mailed a "Letter of Dismissal" to Mr. Bone, stating therein that his dismissal was effective immediately due to his gross misconduct. The letter contained the following:

1. You are guilty of Gross Misconduct.

    a. On the Shift of May 16th and 17th, 1978 you reported for duty and took your post and shortly thereafter you departed that post, claiming illness.

b.   The Deputy Superintendent informed your Shift Commander to have you report to his office on the morning of May 17, 1978, early that morning you called the Deputy Superintendent's Secretary and informed her that you would not be in because of car trouble.

c.   The Deputy Superintendent made another appointment with you at a later date, May 24, 1978, again you called the Deputy Superintendent's Secretary and stated that you were going to sleep a couple of hours and go to the Doctor for X-rays. At this time you left a telephone number and the Deputy Superintendent attempted to call you throughout the morning, and the phone was busy.

d.   A letter was mailed to you *outlining* the appointment you had missed and instructing you to be in the Deputy Superintendent's office on the morning of May 29, 1978.

e.   On Friday night, May 26, 1978, you reported to duty with your Shift at 10:20 p.m. and were assigned at hospital security at Wheeling Park Hospital on an inmate from this institution who was a patient in the hospital.

You were driven to the hospital and after you arrived, you did *not* relieve the officer on duty, you did *not* go to the room, rather you called your Shift Commander and refused to take the post because there was a civilian in the room. The Shift Commander attempted to explain to you that you wee not responsible for the civilian and still you refused to take your post.

Upon this appeal the petitioner assigns the following errors:

(1) That the Commission erred in its finding that Robert O. Bone was guilty of gross misconduct which justified discharge.

(2) That the Commission erred in its finding that notice and opportunity to respond were not required under the due process clauses of the state constitution or federal constitution or under the mandate of West Virginia Code, Chapter 29, Article 6, Section 10(11).

In determining whether the acts of the appellant, for which he was discharged, constituted gross misconduct justifying such discharge, we must consider the facts and circumstances reflected by the record. In *Thurmond v. Steele*, ___ W. Va. ___, 225 S.E.2d 210 (1976), this Court, considering gross misconduct as a justification for terminating employment, said: "Each case must be determined upon the facts and circumstances which are peculiar to that case." The Court then, noting that it would not demand of a covered employee "such perfection of conduct as to create an intolerable burden", said it would "protect the employee against frivolous, trivial and inconsequential charges; or charges based on conduct which has no rational nexus with the duties to be performed or the rights and interests of the public." See *Guine v. Civil Service Commission*, 149 W. Va. 461, 141 S.E.2d 364 (1965) and *Mindel v. United States Civil Service Commission*, 312 F. Supp. 485 (N.D. *Calif.*, 1970).

In the instant case the discharged employee refused three times to carry out a lawful order. He contends that he was not adequately instructed by his superior how to proceed when the inmate patient is in a room with a non-inmate patient. In the circumstances of this case, this contention is without merit.

Mr. Bone did not even report to the hospital room to determine whether there was a security risk situation. He did not relieve the guard on duty and offered no evidence to show that a security risk existed. None, in fact, did exist, as reflected by the testimony of Robert Buzzard, the guard Mr. Bone was to relieve. Mr. Buzzard testified that he experienced no difficulty on this tour of hospital duty and did not consider this assignment any more dangerous than any other hospital

guard duty; the "civilian" patient was no cause for con-
·cern.

Upon being told by Mr. Bone that he would not obey
his order because "he would not accept the responsibil-
ity of the civilian personnel", Captain Campbell an-
swered "I said he did not have to assume the responsi-
bility. His only duty was to maintain security and
assume the responsibility of that inmate." Mr. Bone per-
sisted in his refusal to carry out a lawful order.

A copy of the Rules and Regulations governing officer
procedure at Outside Hospital is included in the record.
Such rules fully instruct a guard on hospital duty as to
the procedures he should follow during such duty. If
security becomes a problem the rules provide for back-
up assistance from the penitentiary. Mr. Bone, having
refused to report to his assigned station, was in no posi-
tion to complain about the lack of security measures.
While the rules do not speak of a non-inmate patient
being in a room with an inmate, an experienced guard,
such as the appellant, who testified that he had per-
formed hospital duty fifty to sixty times, should have no
difficulty in coping with the situation, especially since he
could receive assistance, if needed.

It would indeed be an unusual circumstance which
would permit a penitentiary guard to make his own de-
termination as to the lawfulness of an order given him.
Such guard is charged with the safety, not only of the
inmates but also of the public on certain occasions. He is
in a position similar to that of personnel in the military
service. To obey orders from his superiors is a prime
obligation of his employment and the flagrant disobedi-
ence thereof constitutes substantial cause for dismissal.
of course, if the order were blatantly unlawful, the
guard should be held blameless upon his refusal to obey.
No such unlawful order was involved in this case and
the employee's persistent refusal to obey the lawful or-
der of his superior officer constituted gross misconduct
warranting dismissal. See 15 Am. Jur. 2d, *Civil Service*,
Section 61 and 63.

The appellant, asserting that the procedural requirements of *W. Va. Code,* 1931, 29-6-10 (11), as amended, were not followed, contends that he was deprived of due process of law under the federal and state constitutions. In pertinent part, the above code section provides:

> Discharge or reduction of these [classified service] employees shall take place only after the person to be discharged or reduced has been presented with the reasons for such discharge or reduction stated in writing, and has been allowed a reasonable time to reply thereto in writing, or upon request to appear personally and reply to the appointing authority or his deputy.

While the requirements of the above statute were not literally met, we are of the opinion that the record reveals substantial compliance therewith. Admittedly, the appellant was discharged immediately upon his disobedience of a lawful order. This was not a matter of whether he had been incompetent in the performance of his duties; it was, as above found, a matter of gross misconduct, of which he was fully aware and which he chose to commit. Furthermore, three days later he received in writing, the reasons for his discharge. Also, this letter permitted him an opportunity to reply thereto in writing, or upon request to appear personally and reply to the appointing authority or his deputy.

This appellant, Mr. Bone, did not avail himself of the opportunities afforded him, but chose to proceed by appealing his dismissal to the Civil Service Commission. In his letter of appeal he characterized his dismissal as resulting from a "labor dispute". As noted above, we disagree with such characterization and hold that, in the circumstances of this case, there was substantial compliance with the requirements of the above quoted statute.

The contention of the appellant that he was deprived of due process of law under the state and federal constitutions is also without merit. "[D]ue process is flexible

and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). Necessarily implicit in the above quote, which was also expressed in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), is the principle that due process issues must be decided on the facts of the particular case and that once it is determined that due process applies, the question to be answered is what process is due.

The *Morrissey* court said:

> Once it is determined that due process applies, the question remains what process is due ... due process is flexible and calls for such procedural protections as the particular situation demands.

Citing and quoting from *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961), that court further said:

> '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.'

We are satisfied under the circumstances of this case, that the procedures of which the appellant claims he was deprived were not constitutionally required. What was the private interest affected by the penitentiary superintendent's action in the present case? Certainly the superintendent's action did not prevent the appellant from seeking other employment. Although he did not say what his job was Mr. Bone testified before the commission that he was then employed.

What was the precise nature of the government function at the time of the incident which brought on this proceeding? The government was charged with the responsibility of guarding a penitentiary inmate and also

of protecting the public. This is an urgent function, one within the very purpose for the establishment of a government. It was Mr. Bone's solemn responsibility to perform this function and this blatant refusal to do so cannot be condoned. Thus, the nature of the private interest which has been impaired and the government power which has been exercised justifies the conclusion that the appellant received all the process to which he was due. See *Goss v. Lopez*, 419 U.S. 565, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).

For the reasons stated herein, the order of the Civil Service Commission is affirmed.

*Affirmed.*

MCGRAW, JUSTICE, *dissenting:*

I cannot join in the Court's opinion; I respectfully dissent.

The Court today condones an obvious violation of the procedural protections afforded to all State employees in the classified service by this State's Civil Service law, and upholds the summary discharges of a State employee who has been employed as a correctional officer at the West Virginia Penitentiary for over two years.

W. Va. Code § 29-6-10(11) [1977] reads in material part:

> For discharge or reduction in rank or grade only for cause of employees in the classified service. Discharge or reduction of these employees shall take place only after the person to be discharged or reduced as been presented with the reasons for such discharge or reduction stated in writing, and has been allowed a reasonable time to reply thereto in writing, or upon request to appear personally and reply to the appointing authority or his deputy. The statement of reasons and the reply shall be filed as a public record with the director.

By virtue of this provision, an employee in classified service must be supplied written notice of the reasons for his discharge before he can be lawfully dismissed, and also he is entitled to a reasonable period of time to reply to the charges, or, upon request, to appear personally and reply to the appointing authority or his deputy. This provision unequivocally precludes summary discharges such as occurred here and should not have been tolerated by the Civil Service Commission or by this Court.

Everyone agrees that the statute was not complied with in this case but the majority, invoking the doctrine of substantial compliance, refuses to enforce the law and thereby seriously weakens the protection afforded State employees by the Civil Service law.

Moreover, the majority has tacitly approved without analysis a regulation of the Civil Service Commission which conflicts with the mandates of the statute. Article 11, Section 2, of the Civil Service Commission regulation provides.

> The Appointing Authority, 15 days after notice in writing to a permanent employee stating specific reasons therefor, may dismiss any employee who is negligent or inefficient in his duties, or unfit to perform his duties, who is found to be guilty of gross misconduct, or who is convicted of any crime involving moral turpitude. *Fifteen days notice shall not be required* for employees in certain classes where the Commission holds by formal action that the public interests are best served by withholding such notice, and shall be *at the discretion of the Appointing Authority for employees in any class when the cause of dismissal is gross misconduct.* (Emphasis supplied.)

The Commission, in its memorandum opinion, being sensitive to this very legal problem, stated that "[w]hile we sanction the dismissal of appellant in this particular situation, we would encourage the department (of cor-

rections) in any future similar situations to effect an immediate suspension followed by a discharge with is normal procedural requirements."

In my view, allowing summary discharges of classified service employees in contravention of W. Va. Code § 29-6-10(11) [1977], works to defeat the general purpose of the Civil Service system "to attract to the service of this State personnel of the highest ability and integrity by the establishment of a system of personnel administration based on merit principles and scientific methods governing the ... discipline ... of its civil employees. ..." *See*, W. Va. Code § 29-6-1 [1977]. Furthermore, the majority's opinion may encourage other government agencies or appointing authorities and the Civil Service Commission itself to ignore the clear dictates of the Civil Service law to the substantial detriment of West Virginia's government employees. Government employees deserve better.

As to the merits of the case, it is worth noting that the Department of Corrections has developed written "Standard Operating Procedures" to be followed by correctional officers performing hospital security duty. These rules, however, do not address the specific situation which faced the appellant nor, despite his substantial experience in hospital security duty, had he never been required to guard a prisoner in the same room with a "civilian." His concern for security was no doubt genuine and legitimate.

I, therefore, believe the record does not support a finding of gross misconduct such as would warrant termination of appellant's employment.

Accordingly, I would reverse the ruling of the Civil Service Commission and hold appellant's discharge unlawful for failure to comply with the notice requirements of W. Va. Code § 29-6-10(11). *See, Synder v. Civil Service Commission* ___ W. Va. ___, 238 S.E.2d 892 (1977).