475 S.E.2d 426

**STATE of West Virginia ex rel. Michael S. WHITE, Petitioner Below, Appellant,**

v.

**Michael TODT, Administrator, William R. Sharpe, Jr. Hospital; Ted Johnson, Interstate Compact Administrator, West Virginia Department of Health and Human Resources, Respondents Below, Appellees.**

No. 23271.

Supreme Court of Appeals of West Virginia.

Submitted May 2, 1996.

Decided July 8, 1996.

---

W.T. Weber, III, Weber & Weber, Weston, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara L. Baxter, Assistant Attorney General, Charleston, for Appellees.

McHUGH, Chief Justice:

The appellant, Michael S. White, appeals the October 16, 1995 order of the Circuit Court of Lewis County which denied him habeas corpus relief. The appellant, who, it is asserted, left a Lincoln, Nebraska psychiatric facility without permission while under involuntary commitment, maintains that he has been illegally detained at the William R. Sharpe, Jr. Hospital, a state mental health facility in Lewis County. More specifically, the appellant challenges the procedure used to return an escaped dangerous or potentially dangerous patient set forth in the Interstate Compact on Mental Health found in *W. Va.Code*, 27–14–1, *et seq.* The appellees are Michael Todt, the Administrator of the William R. Sharpe, Jr. Hospital and Ted Johnson, the Interstate Compact Administrator of the West Virginia Department of Health and Human Resources (hereinafter the "WVDHHR"). For reasons explained below, we affirm the circuit court's order.

I.

According to the appellees, the appellant was sentenced to six to eight years in the Nebraska State Penitentiary by a Nebraska state court for first degree sexual assault of a child. Evidently, a Nebraska state court found the appellant to be a mentally disordered sex offender and, thus, sent him to the Lincoln Regional Center, a mental health facility, for one year and, thereafter, to the penitentiary for three and one-half years.

Upon being released from prison in June of 1994, the appellant was committed under a Nebraska civil commitment order to the Lincoln Regional Center. On September 19, 1995, the appellees allege that the appellant left the Lincoln Regional Center without permission or authority while under involuntary civil commitment. Soon thereafter, the Nebraska officials contacted the Interstate Compact Administrator (hereinafter "Administrator") in West Virginia, the person appointed to act as the general coordinator of activities under the Interstate Compact on Mental Health in West Virginia.[1] The Ad-

---

1. Article X(a) of *W. Va.Code*, 27–14–1 [1957] describes the Administrator's duties as follows:

    Each party state shall appoint a 'compact administrator' who, on behalf of his state, shall act as general coordinator of activities under the compact in his state and who shall receive copies of all reports, correspondence, and other documents relating to any patient processed under the compact by his state either in the capacity of sending or receiving state. The compact administrator or his duly designated representative shall be the official with whom

ministrator was informed that Nebraska officials had obtained an arrest warrant for the appellant's return to the Lincoln Regional Center. The Administrator was further informed that the appellant may have sought refuge with his parents who lived in Roane County, West Virginia.

In response to the information provided by the Nebraska officials, the Administrator issued an order on September 29, 1995, authorizing the police to apprehend the appellant and take him to the William R. Sharpe, Jr. Hospital in West Virginia until arrangements could be made to return him to Nebraska.[2] The appellant was apprehended and taken to the William Sharpe, Jr. Hospital on or about September 29, 1995.

Thereafter, without holding a hearing, the Administrator made arrangements with Nebraska officials to return the appellant to Nebraska. In response, the appellant filed a *pro se* petition for a writ of habeas corpus in the Circuit Court of Lewis County. The circuit court appointed counsel to represent the appellant on October 5, 1995, and on October 9, 1995, issued a rule to show cause in order to determine whether the appellant should be detained and returned to Nebraska.

After a hearing was held, the circuit court denied the appellant's request for habeas corpus relief in an order dated October 16, 1995. The circuit court concluded in that order that the appellant was the "same Michael S. White, who was committed to the Lincoln Regional Center and escaped from that facility." Additionally, the circuit court found, *inter alia,* that the states of Nebraska and West Virginia followed the proper proce-

dures for returning the appellant to the custody of the Nebraska officials. Thus, the circuit court ordered that the appellant continue to be detained at the William Sharpe, Jr. Hospital until the "demanding agent from the State of Nebraska appears to take custody of" the appellant.

## II.

### Introduction

The appellant raises numerous assignments of error, all of which relate to the procedure which should be utilized when returning a dangerous or potentially dangerous patient who has escaped from another state's mental health facility. At issue is the Interstate Compact on Mental Health found in *W. Va.Code,* 27–14–1, *et seq.*[3] The Interstate Compact on Mental Health has been adopted by approximately 45 states for the purpose of providing the best treatment for the mentally ill while protecting society through cooperative action between those states that have adopted the compact. *See* N.Y. *Mental Hygiene Law* § 67.07 at historical and statutory notes, complementary legislation (McKinney 1996) (lists the states that have adopted the compact). The purpose of Interstate Compact on Mental Health is more explicitly enunciated in article I of *W. Va.Code,* 27–14–1 [1957]:

The party states find that the proper and expeditious treatment of the mentally ill and mentally deficient can be facilitated by cooperative action, to the benefit of the patients, their families, and society as a whole. Further, the party states find that the necessity of and desirability for fur-

---

other party states shall deal in any matter relating to the compact or any patient processed thereunder.
The legislature further elaborated on the authority of the Administrator in *W.Va.Code,* 27–14–2 [1977]:
The director of health shall be the compact administrator and, acting jointly with like officers of other party states, shall have power to promulgate rules and regulations to carry out more effectively the terms of the compact. The compact administrator is hereby authorized, empowered and directed to cooperate with all departments, agencies and officers of and in the government of this state and its subdivisions in facilitating the proper adminis-

tration of the compact or of any supplementary agreement or agreements entered into by this state thereunder.

**2.** In early September of 1995, the appellant requested a "transfer" of commitment from Nebraska to West Virginia. According to the appellees, two days after the appellant left the Lincoln Regional Center without permission his request for a "transfer" was denied by the Administrator of WVDHHR.

**3.** Nebraska also has adopted the Interstate Compact on Mental Health which is found in *Neb. Rev.Stat.* § 83–801, *et seq.* (1994).

nishing such care and treatment bears no primary relation to the residence or citizenship of the patient but that, on the contrary, the controlling factors of community safety and humanitarianism require that facilities and services be made available for all who are in need of them. Consequently, it is the purpose of this compact and of the party states to provide the necessary legal basis for the institutionalization or other appropriate care and treatment of the mentally ill and the mentally deficient under a system that recognizes the paramount importance of patient welfare and to establish the responsibilities of the party states in terms of such welfare.

In furtherance of the above purpose, the legislature enacted article V of *W. Va.Code,* 27–14–1 [1957] to specifically address how party states should deal with escaped dangerous or potentially dangerous patients:

> Whenever a dangerous or potentially dangerous patient escapes from an institution in any party state, that state shall promptly notify all appropriate authorities within and without the jurisdiction of the escape in a manner reasonably calculated to facilitate the speedy apprehension of the escapee. *Immediately upon the apprehension and identification of any such dangerous or potentially dangerous patient, he shall be detained in the state where found pending disposition in accordance with the law.*

(emphasis added). Our focus in this opinion will be on article V of the compact.

The appellant is most concerned with the phrase "he shall be detained in the state where found pending disposition in accordance with the law." The appellant's concern primarily arises from the fact that, aside from stating that a person "shall be detained in the state where found pending disposition in accordance with the law[,]" there is no explicit mechanism in article V of the Interstate Compact on Mental Health by which a dangerous or potentially dangerous patient, who has allegedly escaped from another state's mental health facility, is returned to the state from where he or she escaped. Thus, the appellant concludes that article V violates due process, is unconstitutionally vague, and unconstitutionally delegates legislative power to an administrative agency.

▮ We could not find, nor did the parties submit to us, any cases from other jurisdictions which have directly addressed the issue of what constitutional protection under the due process clause should be afforded an escaped dangerous or potentially dangerous patient by the detaining state pursuant to the Interstate Compact on Mental Health prior to returning the patient to the state from where he or she escaped. Therefore, initially we must address the appellant's arguments by generally outlining what due process requires when detaining a mentally ill person.[4]

---

**4.** This case is one of procedural due process because the appellant's argument is that certain constitutionally required procedures were not afforded to him. If, however, the appellant had made a substantive due process argument, we note that syllabus point 6 of *Sharon Steel Corp. v. City of Fairmont,* 175 W.Va. 479, 334 S.E.2d 616 (1985), *appeal dismissed by* 474 U.S. 1098, 106 S.Ct. 875, 88 L.Ed.2d 912 (1986), addresses this issue:

> 'The legislature is vested with a wide discretion in determining what the public interest requires, the wisdom of which may not be inquired into by the courts; however, to satisfy the requirements of due process of law, legislative acts must bear a reasonable relationship to proper legislative purpose and be neither arbitrary nor discriminatory.' Syllabus Point 1, *State v. Wender,* 149 W.Va. 413, 141 S.E.2d 359 (1965), *overruled on other grounds, Hartsock–Flesher Candy Co. v. Wheeling Wholesale*

*Grocery Co.,* 174 W.Va. 538, 328 S.E.2d 144 (1984).

In that the Interstate Compact on Mental Health was clearly adopted by the legislature in order to better address the needs of the mentally ill while at the same time protect the public, we find that it is reasonable and not arbitrary. Therefore, the Interstate Compact on Mental Health does not violate substantive due process.

Additionally, the appellant, without explanation, states that the Interstate Compact on Mental Health violates equal protection principles. We disagree. Even if a mentally ill person was a suspect class (which we are not deciding today), and the strict scrutiny test set forth in *Lewis v. Canaan Valley Resorts, Inc.,* 185 W.Va. 684, 691, 408 S.E.2d 634, 641 (1991) applied, the compact would not violate equal protection principles because there is a compelling state interest in protecting both the mentally ill and society. Accordingly, we find this argument to be without merit.

## A.

### *Due Process*

■ Due process is succinctly stated in article III, § 10 of the *West Virginia Constitution:* "No person shall be deprived of life, liberty, or property, without due process of law, and judgment of his peers."[5] We note that

> [w]hen due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been impaired by government action.

Syl. pt. 2, *Bone v. W. Va. Dept. of Corrections,* 163 W.Va. 253, 255 S.E.2d 919 (1979). Clearly, committing a person to a mental health facility involves a loss of liberty which implicates the due process clause. Indeed, the Supreme Court of the United States has noted: "This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330–31 (1979). *See, e.g., Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); and *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). *See also State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 435, 202 S.E.2d 109, 122 (1974) (An adjudication of insanity is a partial deprivation of liberty).

An individual faced with involuntary civil commitment in this state is afforded a wide range of due process protections in *W. Va. Code,* 27–5–1, *et seq.* For instance, within

twenty-four hours of being initially detained, a person who is alleged to need involuntary civil commitment must be taken before a mental hygiene commissioner, magistrate, or circuit court judge for a probable cause hearing. *See W. Va. Code,* 27–5–2(b)(4) and (5) [1992].

Because of the adverse impact an involuntary commitment may have on a person, the due process procedures found in *W. Va. Code,* 27–5–1, *et seq.* are very important.[6] Equally important, however,

> [t]he State has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

*Addington,* 441 U.S. at 426, 99 S.Ct. at 1809, 60 L.Ed.2d at 331.

Thus, although like a criminal defendant, a person facing involuntary civil commitment is faced with losing significant liberty interests, the reason behind taking away the mentally ill person's liberty is very different. Therefore, the two situations warrant different due process protections: "In a civil commitment state power is not exercised in a punitive sense. . . . [Indeed,] a civil commitment proceeding can in no sense be equated to a criminal prosecution." *Id.* at 428, 99 S.Ct. at 1810, 60 L.Ed.2d at 332 (footnote omitted). *See also Allen v. Illinois,* 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (Due process does not require that a person be afforded protection against self-incrimination under the Illinois Sexually Dangerous Persons Act because the purpose of the act is for treatment rather than punishment). As the Supreme Court of the United States has more fully explained:

---

**5.** Similarly, *U.S. Const.* amend. V states, in relevant part, that no person shall "be deprived of life, liberty, or property, without due process of law[.]" *U.S. Const.* amend. XIV likewise states, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law[.]"

**6.** In fact, in *State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 202 S.E.2d 109 (1974) this Court found that portions of the 1931 version of *W.Va. Code,* 27–5–1, *et seq.* were applied in a manner

which deprived a person of procedural due process. More specifically, this Court found, *inter alia,* that a person faced with involuntary commitment (1) had a right to be informed of the facts underlying and supporting the application for involuntary commitment; (2) had a right to be present at the hearing which determined whether or not involuntary commitment was appropriate; and (3) had a right to be represented by counsel.

[T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists.

*Addington*, 441 U.S. at 429, 99 S.Ct. at 1811, 60 L.Ed.2d at 333 (emphasis provided).

Furthermore, the Supreme Court of the United States has noted that the state's focus when dealing with a mentally ill person is much different than its focus when dealing with a criminal defendant:

It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction, 5 J. Wigmore, Evidence § 1400 (Chadbourn rev. 1974). However, even though an erroneous confinement should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected. Moreover, it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty. One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma.... It cannot be said, therefore, that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed. *Id.* at 428–29, 99 S.Ct. at 1810–11, 60 L.Ed.2d at 332–33. Therefore, the due process protection afforded to a mentally ill person must be tailored to meet the unique circumstances of protecting him or her while at the same time protecting society. *Cf. Bone v. W. Va. Dept. of Corrections,* 163 W.Va. 253, 259–60, 255 S.E.2d 919, 922 (1979) (" '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).").

■ This Court has provided guidelines for determining what due process requires outside of the criminal arena in syllabus point 2 of *North v. W. Va. Bd. of Regents,* 160 W.Va. 248, 233 S.E.2d 411 (1977):

Applicable standards for procedural due process, outside the criminal area, may depend upon the particular circumstances of a given case. However, there are certain fundamental principles in regard to procedural due process embodied in Article III, Section 10 of the West Virginia Constitution, which are[:] First, the more valuable the right sought to be deprived, the more safeguards will be interposed. Second, due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise. Third, a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation.

*See also* syl. pt. 2, *Higginbotham v. Clark,* 189 W.Va. 504, 432 S.E.2d 774 (1993).[7] Moreover, we further stated that "some type of an orderly hearing is the cornerstone of procedural due process." *North,* 160 W.Va. at 253, 233 S.E.2d at 415 (*citing Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

In applying the first principle enunciated in *North* to the instant case, we note that

---

**7.** We note that the Supreme Court of the United States has similarly outlined the following principles which must be considered when determining what procedural protections are constitutionally required:

First, the private interest that will be affected by the official action; second the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safe-

guards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976). *See also City of Huntington v. Black,* 187 W.Va. 675, 679, 421 S.E.2d 58, 62 (1992).

although detaining the appellant and returning him as an escaped dangerous or potentially dangerous patient to Nebraska involves the loss of liberty, the more significant loss of liberty occurred when the appellant was originally involuntarily committed in Nebraska. Therefore, the process due the appellant when he was involuntarily committed in Nebraska should have been greater than the process due in this State before his return to Nebraska.

The Interstate Compact on Mental Health specifically states: "Immediately upon the apprehension and *identification* of any such dangerous or potentially dangerous patient, he shall be detained in the state where found pending disposition in accordance with the law." Article V, in relevant part, *W. Va. Code*, 27–14–1 [1957] (emphasis added). The above language clearly mandates that the dangerous or potentially dangerous patient be identified. As we previously noted, "some type of an orderly hearing is the cornerstone of procedural due process." *North*, 160 W.Va. at 253, 233 S.E.2d at 415. Thus, we conclude that the due process clause requires that an escaped dangerous or potentially dangerous patient be afforded the opportunity to have a hearing in order to establish his or her identity before being returned to the requesting state.[8]

However, this hearing need not address whether the mentally ill patient was properly committed in the first instance, nor should it address whether the mentally ill patient is a "dangerous or potentially dangerous patient" who has escaped. The state from where the dangerous or potentially dangerous patient has escaped is in the best position to evaluate these issues.

However, the hearing should address whether the individual being detained by this State pursuant to article V of the Interstate Compact on Mental Health is indeed the dangerous or potentially dangerous patient who escaped from the state requesting his or her return. If it is determined that the individual being detained is the dangerous or potentially dangerous patient who escaped, then this State should promptly return that individual to the state requesting his or her return. Thus, we agree with the appellant's assertion that due process requires that an alleged escaped dangerous or potentially dangerous patient be afforded the opportunity to request a hearing to challenge his or her identification before being returned to the state requesting his or her return.

Implicit in this requirement, that an opportunity to request a hearing be afforded, is that the dangerous or potentially dangerous patient be informed as to why he or she is being detained. Additionally, we find the potential loss of liberty to be significant

---

8. An analogy may be made to a person being detained and returned to another state pursuant to our extradition statutes found in *W.Va.Code*, 5–1–7 to 13. Our extradition statutes outline procedures whereby a person, against whom criminal charges are pending, is transferred from one state to another. When a person is being held in this State in connection with an extradition proceeding, *W.Va.Code*, 5–1–9 [1937] requires that he or she be informed by a judge of a court of record in this State that he or she may apply for a writ of habeas corpus. This Court has made clear, however, that the purpose of the habeas corpus proceeding is not to delve into whether the criminal charges were properly brought by another state. Syl. pt. 1, *State ex rel. Mitchell v. Allen*, 155 W.Va. 530, 185 S.E.2d 355 (1971), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2048, 32 L.Ed.2d 333 (1972). As we explained in *Mitchell*, a court in this State "can assume that ... [the petitioner's] constitutional rights will be adequately protected in the demanding state where the crime is alleged to have been committed and where such issues should be determined in the first instance." *Id.* at 533–34, 185 S.E.2d at 358 (citations omitted).

Additionally, we note that although the Agreement on Detainers found in *W.Va.Code*, 62–14–1, *et seq.* does not explicitly provide for a pretransfer hearing, this Court held in syllabus point 4 of *State v. Moss*, 180 W.Va. 363, 376 S.E.2d 569 (1988) that a prisoner "is entitled to a hearing before being transferred to another jurisdiction pursuant to Article IV of the Interstate Agreement on Detainers." We also note that the Interstate Compact on Juveniles found in *W.Va.Code*, 49–8–1, *et seq.* explicitly provides for a hearing before a juvenile is returned to a requesting state: Prior to ordering the return of a runaway, a judge must "determine whether for the purposes of this compact the petitioner is entitled to the legal custody of the juvenile ... and whether or not it is in the best interest of the juvenile to compel his return to the state." Article IV of *W.Va.Code*, 49–8–2 [1963]. *See also In re M.D.*, 171 W.Va. 209, 298 S.E.2d 243 (1982). Thus, it is apparent that in situations involving the detainment of a person who is being requested by another state some sort of hearing is mandated.

enough to permit the dangerous or potentially dangerous patient to retain counsel or, if he or she cannot afford to do so, to have counsel appointed to represent him or her at the hearing if he or she chooses to challenge the identification determination. These three requirements are the minimal procedural due process which should be afforded to a person being detained pursuant to article V of the Interstate Compact on Mental Health.

The second principle in syllabus point 2 of *North, supra,* states that "due process must generally be given before the deprivation occurs unless a compelling public policy dictates otherwise." As we more fully explained in *North,* although "the initial deprivation must be surrounded by some due process procedures, these may be rather · minimal if there are prompt post-deprivation hearing procedures giving a fuller measure of due process to the aggrieved party." *Id.* at 254, 233 S.E.2d at 416.

▉ Clearly, there is a compelling public policy to quickly detain a dangerous or potentially dangerous patient in order to protect himself or herself and/or society. Thus, only a minimal amount of due process need be given before a dangerous or potentially dangerous patient is initially detained pursuant to article V of the Interstate Compact on Mental Health. However, the dangerous or potentially dangerous patient who is detained pursuant to article V of the Compact must be promptly afforded the opportunity to request a hearing to challenge his or her identification.

▉ The appellant argues that the minimal amount of due process accorded to a person before he or she may be initially

detained pursuant to article V requires that a mental hygiene commissioner, magistrate, or judge issue the order to detain that person, rather than the Administrator. Our examination of the Interstate Compact on Mental Health leads us to a different conclusion.

Article X of *W. Va. Code,* 27–14–1 [1957] explicitly states that the Administrator

> shall act as general coordinator of activities under the compact in his state and . . . shall receive copies of all reports, correspondence, and other documents relating to any patient processed under the compact by his state either in the capacity of sending or receiving state. *The compact administrator or his duly designated representative shall be the official with whom other party states shall deal in any matter relating to the compact or any patient processed thereunder.*

(emphasis added). In that the legislature has specifically stated that the Administrator is the official who deals with other party states on matters relating to any patient processed under the compact, the legislature has impliedly authorized the Administrator, rather than a mental hygiene commissioner, magistrate, or judge, to issue an order requesting that a dangerous or potentially dangerous patient who has escaped be detained. Accordingly, we find there is no due process violation by having the Administrator issue an order to detain an escaped dangerous or potentially dangerous patient.[9]

The third principle set forth in syllabus point 2 of *North, supra,* is that "a temporary deprivation of rights may not require as large a measure of procedural due process protection as a permanent deprivation." *Id.* When this state is asked to detain a danger-

9. The authority given to the Interstate Compact Administrator to be the official with whom the other states contact is not unlike the authority of the Governor under the extradition statutes which we have previously discussed. More specifically, pursuant to *W.Va.Code,* 5–1–8 [1937], the Governor is authorized to sign a warrant of arrest directing any peace officer or other person whom the Governor may think fit to arrest the person who is being requested by another state. *W.Va.Code,* 5–1–8 [1937] cautions that "[t]he warrant must substantially recite the facts necessary to the validity of its issuance." However, the extradition statutes do not require that a magistrate or court issue the arrest warrant.

The Administrator is an executive branch member who carries out a function similar to that of the Governor under the extradition statutes.

Furthermore, if a patient escapes from a mental health facility in this state the chief medical officer, who is pursuant to *W.Va.Code,* 27–1–13 [1974] the "physician responsible for medical programs within a mental health facility", is authorized to "issue an order directed to the sheriff of the county in which the patient is a resident, commanding him to take into custody and transport such escaped person back to the mental health facility[.]" *W.Va.Code,* 27–7–5 [1977].

ous or potentially dangerous patient who has escaped from a mental health facility in another state, this state is only **temporarily** detaining the patient until arrangements can be made to return the patient to the mental health facility from which he or she escaped. Thus, the detention of an escaped dangerous or potentially dangerous patient does not require the same level of procedural due process protection as is required before a person is involuntarily committed to a mental health facility in the first instance.

■ Accordingly, we hold that when a dangerous or potentially dangerous patient who has escaped from a mental health facility in another state is being detained in this State pursuant to article V of the Interstate Compact on Mental Health found in *W. Va. Code*, 27–14–1 [1957], the due process clause found in article III, § 10 of the *Constitution of West Virginia* requires, at a minimum, that before this State returns the dangerous or potentially dangerous patient to the state from where he or she has escaped, the dangerous or potentially dangerous patient be informed of the reason he or she is being detained, the dangerous or potentially dangerous patient be afforded a hearing to determine identification and the dangerous or potentially dangerous patient be afforded the opportunity to have the representation of counsel in the event he or she decides to challenge the identification.

The appellant had a hearing on his habeas corpus petition in the Circuit Court of Lewis County. Furthermore, the appellant was appointed counsel to represent him in that proceeding. That hearing and the appointment of counsel satisfied the constitutional requirement that a hearing be held in this State for identification purposes.

## B.

### Unconstitutional Vagueness

■ Next, we address the appellant's assertion that article V of the Interstate Compact on Mental Health is unconstitutionally vague and, thus, violates the due process clause of our *Constitution.* We have made clear that "[t]he vagueness standard may vary depending on the type of statute involved." *Hartsock–Flesher Candy Co. v. Wheeling Wholesale Grocery, Co.*, 174 W.Va. 538, 546, 328 S.E.2d 144, 152 (1984), *holding modified on another point by, Gibson v. W. Va. Dept. of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991). However, the general premise is that "[a]s a matter of basic procedural due process, a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Garcelon v. Rutledge*, 173 W.Va. 572, 574, 318 S.E.2d 622, 625 (1984) (*quoting Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322, 328 (1926)). This Court, relying on a United States Supreme Court decision, has acknowledged two reasons for this rule:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. *Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.*

*Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222, 227–28 (1972) (footnotes omitted and emphasis added). *See also Village of Hoffman Estates v. Flipside Hoffman Estates*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362, 371 (1982) (The Supreme Court of the United States stated that the above quote from *Grayned, supra*, established the standards for evaluating vagueness); *Hartsock–Flesher Candy Co.*, 174 W.Va. at 546, 328 S.E.2d at 152; *Garcelon*, 173 W.Va. at 574–75, 318 S.E.2d at 625. The appellant's argument focuses on the second rationale for the vagueness rule: Whether the lack of "explicit standards" in the Interstate Com-

pact on Mental Health will lead to arbitrary and discriminatory enforcement of article V.

■ Although this Court has adopted standards for determining whether a statute is vague in the criminal arena [10] and in areas involving economic matters,[11] we have not had an opportunity to address when laws are vague because they fail to set forth explicit standards for those who apply them. We find that the Supreme Court of the United States has best expressed the standard which should be applied through its explanation of the second reason to apply the vagueness doctrine stated in *Grayned, supra.* Accordingly, we hold that the due process clause found in article III, § 10 of the *Constitution of West Virginia* requires that laws provide explicit standards for those who apply them so as to prevent arbitrary and discriminatory enforcement of the laws.

■ In applying the above standard we reemphasize that article V of the Interstate Compact explicitly states: "Immediately upon the apprehension and identification of any such dangerous or potentially dangerous patient, he shall be detained in the state where found pending disposition in accordance with law." *W. Va.Code,* 27–14–1 [1957]. Additionally, article X(b) states: "The compact administrators of the respective party states shall have power to promulgate reasonable rules and regulations to carry out more effectively the terms and provisions of this compact." *W. Va.Code,* 27–14–1 [1957]. While the Compact does not set forth exact procedures which a state must follow when detaining an escaped dangerous or potentially dangerous patient, it allows each state to determine how it will accomplish the mandates of article V when

returning an escaped dangerous or potentially dangerous patient. As noted above, the Compact specifically states that the dangerous or potentially dangerous patient must be identified upon being detained and specifically authorizes the Administrator to promulgate rules and regulations to carry out the provisions of the Compact. Thus, the Compact provides explicit standards for its enforcement. Accordingly, based upon the reasoning above, we find that the Interstate Compact on Mental Health is not unconstitutionally vague.

■ We find it significant to note, however, that in the case before us, the Administrator has not promulgated rules and regulations governing how an escaped dangerous or potentially dangerous patient is detained. Because there are no rules or regulations in place, there is no assurance that article V will not be implemented in an arbitrary and discriminatory manner. Thus, in order to ensure that article V is not implemented in an arbitrary and discriminatory manner so as to violate a person's right to procedural due process, the Interstate Compact Administrator must promulgate rules and regulations explicitly outlining the procedure to be utilized in order to ensure that the minimum procedural due process we previously outlined is afforded to a person who is detained pursuant to article V of the Interstate Compact on Mental Health.[12]

## C.

*Delegation of Powers to Administrative Agency*

■ The appellant essentially argues that the Interstate Compact on Mental Health is

---

**10.** For instance, in syllabus point 2 of *State v. DeBerry,* 185 W.Va. 512, 408 S.E.2d 91 (1991), *cert. denied,* 502 U.S. 984, 112 S.Ct. 592, 116 L.Ed.2d 616 (1991), this Court held that " '[a] criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication.' Syl. pt. 1, *State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974)." This standard clearly follows the first reason to apply the vagueness rule expressed in *Grayned, supra.*

**11.** For example, in syllabus point 3 of *Hartsock– Flesher Candy Co., supra,* this Court held that

"[i]t is appropriate under the Due Process Clause vagueness doctrine to apply a less restrictive test to statutes or ordinances involving economic matters in which criminal penalties are not at issue."

**12.** We note that not only has the Administrator failed to promulgate rules and regulations regarding the implementation of article V of the Interstate Compact on Mental Health, but we could not find any rules and regulations governing any portion of the Compact. Although this case only concerns the need to promulgate rules and regulations to implement article V, we point out that the Administrator should address how all provisions of the Interstate Compact on Mental Health are to be implemented in this State.

an unconstitutional delegation of legislative powers in violation of *W. Va. Const.* art. VI, § 1 which states, in relevant part: "The legislative power shall be vested in a senate and house of delegates." The appellant relies upon syllabus point 3 of *State ex rel. Mountaineer Park v. Polan,* 190 W.Va. 276, 438 S.E.2d 308 (1993):

'As a general rule the Legislature, in delegating discretionary power to an administrative agency, such as a board or a commission, must prescribe adequate standards expressed in the statute or inherent in its subject matter and such standards must be sufficient to guide such agency in the exercise of the power conferred upon it.' Syl. pt. 3, *Quesenberry v. Estep,* 142 W.Va. 426, 95 S.E.2d 832 (1956).

However, this Court has also held that " '[t]he delegation by the legislature of broad discretionary powers to an administrative body, accompanied by fitting standards for their exercise, is not of itself unconstitutional.' Point 8 Syllabus, *Chapman v. Huntington, West Virginia, Housing Authority,* 121 W.Va. 319 [, 3 S.E.2d 502 (1939) ]." Syl. pt. 5, *State ex rel. W. Va. Hous. Dev. Fund v. Copenhaver,* 153 W.Va. 636, 171 S.E.2d 545 (1969). In fact, in *Copenhaver* the legislature authorized the Board of Directors of the West Virginia Housing Development Fund (hereinafter the "Fund") to execute certain contracts involving federally insured construction loans for housing for the low or moderate income person. The legislature gave the Fund a certain amount of discretion in determining who are persons and families of low and moderate incomes. *Id.* at 650, 171 S.E.2d at 553. However, this Court concluded that such power was given out of necessity and given with sufficient guidelines to guide the Fund in its exercise of discretion. *Id.*

Similarly, in *State ex rel. Marockie v. Wagoner,* 191 W.Va. 458, 446 S.E.2d 680 (1994), this Court found that the legislature's delegation to the School Building Authority (hereinafter the "SBA") of determining whether bonds should be issued and, if so, in what amounts and for which projects, was not an unconstitutional delegation of legislative powers. More specifically, this Court stated: "The legislature did not give the SBA purely legislative functions; however, the legislature out of necessity gave the SBA certain discretionary powers and provided sufficient guidelines to guide the SBA in its exercise of discretion." *Id.* at 469, 446 S.E.2d at 691.

Likewise, in the case before us, the mere fact that the Interstate Compact Administrator may have broad powers under the Interstate Compact on Mental Health does not mean there has been unconstitutional delegation of legislative power. To the contrary, as we have previously noted, the Interstate Compact on Mental Health specifically states that a dangerous or potentially dangerous patient detained pursuant to article V must be identified before being returned to the state that is requesting his or her return. Thus, the Compact mandates that there must be some process whereby the detained dangerous or potentially dangerous patient is identified prior to the patient's return to the state that is requesting his or her return. The legislature, out of necessity, left to the Administrator's determination the precise procedures that should be followed when detaining and returning an escaped dangerous or potentially dangerous patient pursuant to article V of the Interstate Compact on Mental Health. Accordingly, we hold that the Interstate Compact on Mental Health does not violate *W. Va. Const.* art. VI, § 1.

### III.

As noted above, we do not accept the appellant's contention that because due process was not initially accorded to him he should be released from the William R. Sharpe, Jr. Hospital in Lewis County and not returned to the Nebraska officials. The facts clearly indicate that appellant was appointed counsel to represent him at a habeas corpus proceeding in which it was determined that he was indeed the person who escaped from the mental health facility in Nebraska.[13]

---

**13.** In fact, the appellant's attorney stated at the October 13, 1995 hearing on his petition for a writ of habeas corpus that "[w]e're not disputing the fact that ... [the appellant] was involuntarily committed in the state of Nebraska[.]"

Therefore, we find that the appellant has been accorded due process in this case.[14] Accordingly, we affirm the October 16, 1995 order of the Circuit Court of Lewis County that denied appellant's request for habeas corpus relief.[15]

Affirmed.

14. We note that in *State ex rel. Hawks, supra,* this Court found that the State's attempt to correct the procedural errors which violated the patient's right to due process at a later hearing did not prevent this Court from granting a writ of habeas corpus: "The ... [director of clinical services of Huntington State Hospital] cannot deprive citizens of court review of a widespread violation of constitutional rights by curing procedural irregularities in individual cases after they have been brought to the court's attention." 157 W.Va. at 422, 202 S.E.2d at 115.

*Hawks* is distinguishable from the case now before us for at least three reasons. First, the case involved a commitment proceeding held in this State rather than the return of an escaped dangerous or potentially dangerous patient to another state. Second, the procedural due process problems in that case were more egregious than the problems in the case before us. Third, in *Hawks* this Court did not consider that the purpose of involuntary commitment of protecting the mental health patient and/or society is different than the purpose of a criminal proceeding which is to punish. In fact, in *Hawks* this Court stated that the same due process standards in civil and criminal proceedings must apply in an involuntary commitment proceeding. We have explained in this opinion that the specific due process protections afforded to an individual depends upon the unique circumstances of the situation. In particular, we have explained the difference between the considerations at issue in an involuntary commitment proceeding and at issue in a criminal proceeding. To the extent that *Hawks* implies there is no difference, we hereby clarify that there is.

Additionally, we note that if an escaped dangerous or potentially dangerous patient is, in the future, detained and returned to the state from where he or she escaped pursuant to article V of the Compact without being afforded the minimum due process set forth in this opinion, then that patient may bring a petition for a writ of habeas corpus to challenge his or her detainment as the appellant did in the case before us. After all, the purpose of a habeas corpus is to "test the legality of the restraint under which a person is detained." *Tasker v. Griffith,* 160 W.Va. 739, 742, 238 S.E.2d 229, 231 (1977).

15. The appellant raises the following additional assignments of error: (1) the circuit court erred by determining that he was an escaped dangerous mentally ill patient; (2) the circuit court erred by admitting and ruling upon appellant's commitment proceedings in Nebraska; (3) the circuit court erred by admitting the testimony of a diagnostic social worker from Nebraska's Lincoln Regional Center regarding the Nebraska commitment proceedings; (4) the circuit court erred in finding that the appellant needs additional treatment for his mental illness; and (5) the circuit court erred by admitting the Nebraska arrest warrant issued after appellant escaped from the Lincoln Regional Center because its validity is suspect.

The above assignments of error address the admittance of evidence at the habeas hearing which went beyond simply determining whether the appellant was indeed the person who escaped from the Nebraska mental health facility. Given that the circuit court, in the case before us, determined that the appellant was the person who escaped from the mental health facility in Nebraska, the fact that irrelevant information was introduced did not violate his constitutional rights. Therefore, we decline to further address the above issues.