OPINION OF THE COURT
Chief Judge Kaye.
On January 3, 1999, Kendra Webdale was pushed to her death before an oncoming subway train by a man diagnosed with paranoid schizophrenia who had neglected to take his prescribed medication. Responding to this tragedy, the Legislature enacted Mental Hygiene Law § 9.60 (L 1999, ch 408 [Kendra’s Law]), thereby joining nearly 40 other states in adopting a system of assisted outpatient treatment (AOT) pursuant to which psychiatric patients unlikely to survive safely in the community without supervision may avoid hospitalization by complying with court-ordered mental health treatment.
In enacting the law, the Legislature found that “there are mentally ill persons who are capable of living in the community with the help of family, friends and mental health professionals, but who, without routine care and treatment, may relapse and become violent or suicidal, or require hospitalization” (L 1999, ch 408, § 2). And in mandating that certain patients comply with essential treatment pursuant to a court-ordered written treatment plan, the Legislature further found that “there are mentally ill persons who can function well and safely in the community with supervision and treatment, but who without such assistance, will relapse and require long periods of hospitalization. . . . [S]ome mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis. Family members and caregivers often must stand by helplessly and watch their loved ones and patients decompensate” (id.).
Studies undertaken in other jurisdictions with AOT laws have found that outpatients subject to court orders had fewer psychiatric admissions, spent fewer days in the hospital and had fewer incidents of violence than outpatients without court orders (see Mem of Off of Atty Gen, Bill Jacket, L 1999, ch 408, at 13; Marvin S. Swartz et al., Can Involuntary Outpatient Commitment *367 Reduce Hospital Recidivism?: Findings From a Randomized Trial With Severely Mentally Ill Individuals, 156 Am J Psychiatry 1968 [1999]). Kendra’s Law was thus adopted in an effort to “restore patients’ dignity, and . . . enable mentally ill persons to lead more productive and satisfying lives” (L 1999, ch 408, § 2), while at the same time reducing the risk of violence posed by mentally ill patients who refuse to comply with necessary treatment.
In October 2000, a petition was filed seeking an order authorizing assisted outpatient treatment for respondent K.L. Respondent suffered from schizoaffective disorder, bipolar type, and had a history of psychiatric hospitalization and noncompliance with prescribed medication and treatment, as well as aggressiveness toward family members during periods of decompensation. The treatment prescribed in the proposed order included a regimen of psychiatric outpatient care, case management, blood testing, individual therapy and medication. Pursuant to the plan, respondent was required in the first instance to orally self-administer Zyprexa. If, however, he was “non-compliant with above,” the plan required that he instead voluntarily submit himself to the administration of Haldol Decanoate by medical personnel.
Respondent opposed the petition, challenging the constitutionality of Kendra’s Law in a number of respects. Supreme Court and the Appellate Division rejected each of respondent’s constitutional arguments, as do we.
I.
Before a court may issue an order for assisted outpatient treatment, the statute requires that a hearing be held at which a number of criteria must be established, each by clear and convincing evidence. The court must find that (1) the patient is at least 18 years of age; (2) the patient suffers from a mental illness; (3) the patient is unlikely to survive safely in the community without supervision, based on a clinical determination; (4) the patient has a history of lack of compliance with treatment for mental illness that has either (a) at least twice within the last 36 months been a significant factor in necessitating hospitalization, or receipt of services in a forensic or other mental health unit of a correctional facility or a local correctional facility, not including any period during which the person was hospitalized or incarcerated immediately preceding the filing of the petition, or (b) resulted in one or more acts of *368 serious violent behavior toward self or others or threats of, or attempts at, serious physical harm to self or others within the last 48 months, not including any period in which the person was hospitalized or incarcerated immediately preceding the filing of the petition; (5) the patient is, as a result of his or her mental illness, unlikely to voluntarily participate in the recommended treatment pursuant to the treatment plan; (6) in view of the patient’s treatment history and current behavior, the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to the patient or others; and (7) it is likely that the patient will benefit from assisted outpatient treatment (see Mental Hygiene Law § 9.60 [c]). The court must also find by clear and convincing evidence that the assisted outpatient treatment sought is the least restrictive treatment appropriate and feasible for the patient (see Mental Hygiene Law § 9.60 [j] [2]).
If an assisted outpatient later fails or refuses to comply with treatment as ordered by the court; if efforts to solicit voluntary compliance are made without success; and if in the clinical judgment of a physician, the patient may be in need of either involuntary admission to a hospital or immediate observation, care and treatment pursuant to standards set forth in the Mental Hygiene Law,[1] then the physician can seek the patient’s temporary removal to a hospital for examination to determine whether hospitalization is required (see Mental Hygiene Law § 9.60 [n]).
II.
Respondent contends that the statute violates due process because it does not require a finding of incapacity before a psy *369 chiatric patient may be ordered to comply with assisted outpatient treatment. He asks that we read such a requirement into the law in order to preserve its constitutionality.
In Rivers v Katz (67 NY2d 485 [1986]), we held that a judicial finding of incapacity to make a reasoned decision as to one’s own treatment is required before an involuntarily committed patient may be forcibly medicated with psychotropic drugs against his or her will. Mental Hygiene Law § 9.60, however, neither authorizes forcible medical treatment in the first instance nor permits it as a consequence of noncompliance with court-ordered AOT.[2]
Nevertheless, respondent urges that, under Rivers, a showing of incapacity is required before a psychiatric patient may be ordered by a court to comply with any assisted outpatient treatment. Although respondent—in asking us to read a requirement of incapacity into the statute—disclaims any effort to strike down the law, such a reading would have the effect of eviscerating the legislation, inasmuch as the statute presumes that assisted outpatients are capable of actively participating in the development of their written treatment plans, and specifically requires that they be afforded an opportunity to do so (see Mental Hygiene Law § 9.60 [i] [1]). Indeed, the law makes explicit that “[t]he determination by a court that a patient is in need of assisted outpatient treatment under this section shall not be construed as or deemed to be a determination that such patient is incapacitated pursuant to article eighty-one” of the Mental Hygiene Law (governing guardianship proceedings) (Mental Hygiene Law § 9.60 [o]).
Respondent concedes that a large number of patients potentially subject to court-ordered assisted outpatient treatment would be ineligible for the program if a finding of incapacity were required. In enacting Kendra’s Law, the Legislature determined that certain patients capable of participating in their own treatment plans could remain safely in the community *370 if released subject to the structure and supervision provided by a court-ordered assisted treatment plan. Such a plan may enable patients who might otherwise require involuntary hospitalization to live and work freely and productively through compliance with necessary treatment.
Since Mental Hygiene Law § 9.60 does not permit forced medical treatment, a showing of incapacity is not required. Rather, if the statute’s existing criteria satisfy due process—as in this case we conclude they do—then even psychiatric patients capable of making decisions about their treatment may be constitutionally subject to its mandate.
While “[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body” (Schloendorff v Society of N.Y. Hosp., 211 NY 125, 129 [1914]) and to “control the course of his medical treatment” (Matter of Storar, 52 NY2d 363, 376 [1981]), these rights are not absolute. As we made clear in Rivers, the fundamental right of mentally ill persons to refuse treatment may have to yield to compelling state interests (67 NY2d at 495). The state “has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill” (Addington v Texas, 441 US 418, 426 [1979]). Accordingly, where a patient presents a danger to self or others, the state may be warranted, in the exercise of its police power interest in preventing violence and maintaining order, in mandating treatment over the patient’s objection. Additionally, the state may rely on its parens patriae power to provide care to its citizens who are unable to care for themselves because of mental illness (see Rivers, 67 NY2d at 495-496).
The restriction on a patient’s freedom effected by a court order authorizing assisted outpatient treatment is minimal, inasmuch as the coercive force of the order lies solely in the compulsion generally felt by law-abiding citizens to comply with court directives. For although the Legislature has determined that the existence of such an order and its attendant supervision increases the likelihood of voluntary compliance with necessary treatment, a violation of the order, standing alone, ultimately carries no sanction. Rather, the violation, when coupled with a failure of efforts to solicit the assisted outpatient’s compliance, simply triggers heightened scrutiny on the part of the physician, who must then determine whether the patient may be in need of involuntary hospitalization.
*371 Of course, whenever a physician determines that a patient is in need of involuntary commitment—whether such a determination came to be made after an assisted outpatient failed to comply with treatment or was reached in the absence of any AOT order at all—the patient may be hospitalized only if the standards for such commitment contained in the Mental Hygiene Law are satisfied. These standards themselves satisfy due process (see Project Release v Prevost, 722 F2d 960 [2d Cir 1983]). If, however, the noncompliant patient is not found to be in need of hospitalization, the inquiry will be at an end and the patient will suffer no adverse consequence. For as the statute explicitly provides, “Failure to comply with an order of assisted outpatient treatment shall not be grounds for involuntary civil commitment or a finding of contempt of court” (Mental Hygiene Law § 9.60 [n]). Moreover, any restriction on an assisted outpatient’s liberty interest felt as a result of the legal obligation to comply with an AOT order is far less onerous than the complete deprivation of freedom that might have been necessary if the patient were to be or remain involuntarily committed in lieu of being released on condition of compliance with treatment.
In any event, the assisted outpatient’s right to refuse treatment is outweighed by the state’s compelling interests in both its police and parens patriae powers. Inasmuch as an AOT order requires a specific finding by clear and convincing evidence that the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to self or others, the state’s police power justifies the minimal restriction on the right to refuse treatment inherent in an order that the patient comply as directed. Moreover, the state’s interest in the exercise of its police power is greater here than in Rivers, where the inpatient’s confinement in a hospital under close supervision reduced the risk of danger he posed to the community.
In addition, the state’s parens patriae interest in providing care to its citizens who are unable to care for themselves because of mental illness is properly invoked since an AOT order requires findings that the patient is unlikely to survive safely in the community without supervision; the patient has a history of lack of compliance with treatment that has either necessitated hospitalization or resulted in acts of serious violent behavior or threats of, or attempts at, serious physical harm; the patient is unlikely to voluntarily participate in the recommended treat *372 ment plan; the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm to the patient or others; and it is likely that the patient will benefit from assisted outpatient treatment.
In requiring that these findings be made by clear and convincing evidence and that the assisted outpatient treatment be the least restrictive alternative, the statute’s procedure for obtaining an AOT order provides all the process that is constitutionally due.
Nor does Mental Hygiene Law § 9.60 violate equal protection by failing to require a finding of incapacity before a patient can be subjected to an AOT order. Although persons subject to guardianship proceedings and involuntarily committed psychiatric patients must be found incapacitated before they can be forcibly medicated against their will, a court-ordered assisted outpatient treatment plan simply does not authorize forcible medical treatment—nor, of course, could it, absent incapacity. The statute thus in no way treats similarly situated persons differently (see City of Cleburne, Tex. v Cleburne Living Ctr., 473 US 432, 439 [1985]).
III.
Respondent next challenges the detention provisions of Kendra’s Law, contending that the failure of the statute to provide for notice and a hearing prior to the temporary removal of a noncompliant patient to a hospital violates due process.
Under Mental Hygiene Law § 9.60 (n), when an assisted outpatient who persists in the failure or refusal to comply with court-ordered treatment may, in the clinical judgment of a physician, be in need of involuntary hospitalization, the physician may seek the removal of the patient to a hospital for an examination to determine whether hospitalization is indeed necessary. If the assisted outpatient refuses to take medication—or refuses to take or fails a blood test, urinalysis, or alcohol or drug test—as required by the court order, the physician may consider this refusal or failure when determining whether such an examination is needed. A noncompliant patient thus removed under Kendra’s Law may then be retained in the hospital for observation, care and treatment, and further examination, for up to 72 hours, in order to permit a physician to determine whether the patient has a mental illness and is in need of involuntary hospital care and treatment pursuant to the provisions of the *373 Mental Hygiene Law. A patient who at any time during the 72-hour period is determined not to meet the standards for involuntary admission and retention and does not consent to remain must be immediately released.
When the state seeks to deprive an individual of liberty, it must provide effective procedures to guard against an erroneous deprivation. A determination of the process that is constitutionally due thus requires a weighing of three factors: the private interest affected; the risk of erroneous deprivation through the procedures used and the probable value of other procedural safeguards; and the government’s interest (see Mathews v Eldridge, 424 US 319, 335 [1976]).
While we disagree with the Appellate Division’s determination that the involuntary detention of a psychiatric patient for up to 72 hours does not constitute a substantial deprivation of liberty, we nevertheless conclude that the patient’s significant liberty interest is outweighed by the other Mathews factors. In the context of the entire statutory scheme, the risk of an erroneous deprivation pending the limited period during which an examination must be undertaken to determine whether a persistently noncompliant patient is in need of involuntary care and treatment is minimal. For before a court order authorizing an AOT plan is issued, there must already have been judicial findings by clear and convincing evidence that the patient is unlikely to survive safely in the community without supervision; has a history of noncompliance resulting in violence or necessitating hospitalization; and is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which would be likely to result in serious harm. Nor is a court better situated than a physician to determine whether the grounds for detention—persistent noncompliance and the need for involuntary commitment—have been met. A preremoval hearing would therefore not reduce the risk of erroneous deprivation.
In addition, the state’s interest in immediately removing from the streets noncompliant patients previously found to be, as a result of their noncompliance, at risk of a relapse or deterioration likely to result in serious harm to themselves or others is quite strong. The state has a further interest in warding off the longer periods of hospitalization that, as the Legislature has found, tend to accompany relapse or deterioration. The statute advances this goal by enabling a physician to personally examine the patient at a hospital so as to determine whether the *374 patient, through noncompliance, has created a need for inpatient treatment that the patient cannot himself or herself comprehend. A preremoval judicial hearing would significantly reduce the speed with which the patient can be evaluated and then receive the care and treatment which physicians have reason to believe that the patient may need. Indeed, absent removal, there is no mechanism by which to force a noncompliant patient to attend a judicial hearing in the first place.
Respondent contends that a comprehensive psychiatric examination can be easily performed in less than 72 hours after removal. But since the temporary detention permitted by the statute comports with due process, it is not for us to determine whether the 72-hour limit is ideal, or necessary, or wise. As long as the time period satisfies constitutional requirements—which it does—it is not for this Court to substitute its judgment for that of the Legislature.
Finally, we find no violation of the constitutional prohibition against unreasonable searches and seizures (see US Const 4th Amend; NY Const, art I, § 12) in the statute’s failure to specify that a physician must have probable cause or reasonable grounds to believe that a noncompliant assisted outpatient is in need of involuntary hospitalization before he or she may seek the patient’s removal. It is readily apparent that the requirement that a determination that a patient may need care and treatment must be reached in the “clinical judgment” of a physician necessarily contemplates that the determination will be based on the physician’s reasonable belief that the patient is in need of such care.
Accordingly, the order of the Appellate Division should be affirmed, without costs.
Judges G.B. Smith, Ciparick, Rosenblatt, Graffeo and Read concur; Judge R.S. Smith taking no part.
Order affirmed, without costs.

. Under Mental Hygiene Law § 9.27, a person may be involuntarily admitted to a hospital upon the certification of two physicians when he or she is in need of involuntary care and treatment, defined as having “a mental illness for which care and treatment as a patient in a hospital is essential to such person’s welfare and whose judgment is so impaired that he is unable to understand the need for such care and treatment” (Mental Hygiene Law § 9.01). Under Mental Hygiene Law §§ 9.39 and 9.40, persons in need of immediate observation, care and treatment may be admitted to a hospital on an emergency basis when they have a mental illness which is likely to result in serious harm to themselves or others, defined as a “substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or ... a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm” (Mental Hygiene Law § 9.39 [a] [1], [2]).

. Inasmuch as the statute does not—and could not, absent a showing of incapacity—authorize the forcible administration of psychotropic drugs, any AOT order purporting to contain such a direction would exceed the authority of the law. Respondent’s treatment plan contained no such illegal direction. Any persistent refusal to comply with the directive that he voluntarily submit to the administration of Haldol would not have resulted in his being forcibly medicated. Rather, the sole consequence would have been that a physician might then have determined that respondent may have been in need of involuntary hospitalization. In that event, respondent could have been temporarily removed to a hospital for examination (see Mental Hygiene Law § 9.60 [n]).