614 S.E.2d 727

STATE of West Virginia ex rel. Martha Yeager WALKER, Secretary, West Virginia Department of Health and Human Resources; Eugenie P. Taylor, Acting Commissioner, Bureau of Behavioral Health and Health Facilities; and Jack C. Clohan, Jr., Chief Administrator, William R. Sharpe, Jr. Hospital; and Mary Beth Carlisle, Chief Administrator, Mildred Mitchell–Bateman Hospital, Petitioners,

v.

The MENTAL HYGIENE COMMISSIONERS of Boone, Cabell, Clay, Kanawha, Lincoln, Mason, Mercer, Nicholas, Putnam, Wayne, Webster, and Wyoming Counties, Respondents.

Record No. 32514.

Supreme Court of Appeals of West Virginia.

Submitted March 22, 2005.

Decided May 27, 2005.

Darrell V. McGraw, Jr., Attorney General, Stephen J. Small, Senior Assistant Attorney General, Charleston, for the West Virginia Department of Health and Human Resources.

John M. Hedges, Esq., Teresa J. Lyons, Esq., Byrne & Hedges, Morgantown, for Respondents.

## WRIT OF PROHIBITION

STARCHER, J.

In the instant case we hold that under West Virginia's mental hygiene system, persons for whom there has not been a probable cause determination may not be automatically sent to state psychiatric hospitals by virtue of a "blanket" court order. However, the West Virginia Department of Health and Human Resources (which operates the state's psychiatric hospitals) has a duty to cooperate with the circuit courts, local officials and law enforcement, and community mental health centers to ensure that when necessary in an individual case, the safe and therapeutic pre-probable cause detention of such persons occurs—and fulfilling this duty may require, in an individual instance, that a detainee be held at a state psychiatric hospital without having the benefit of a probable cause determination.

### I.

### Facts & Background

The instant case arises from the filing of a Petition for a Writ of Prohibition in this Court by the Secretary of the West Virginia Department of Health and Human Resources; the Acting Commissioner of the State Bureau of Behavioral Health and Health Facilities; and the Chief Administrators of William R. Sharpe, Jr. Hospital ("Sharpe Hospital") and Mildred Mitchell–Bateman Hospital ("Bateman Hospital")

("the petitioners"). Sharpe and Bateman Hospitals are West Virginia's two public acute care psychiatric hospitals.

The petitioners have named as respondents the mental hygiene commissioners in twelve West Virginia counties.[1] Mental hygiene commissioners are attorneys who are appointed by the court to act as judicial officers to conduct proceedings and enter orders in matters arising under West Virginia's "mental hygiene" laws, *W.Va.Code*, 27-1-1 through 27-1-17.[2]

After the filing of a mental hygiene petition, a threshold determination is whether there is probable cause to believe that the individual meets the applicable standard for civil commitment to a hospital for examination and treatment.[3] In most instances this probable cause determination is currently made by a mental hygiene commissioner.[4]

In aid of making that determination, the law authorizes that upon review of a petition for facial sufficiency, an order may issue requiring an individual to be detained and taken into custody—and that thereafter

a prompt probable cause determination be made, according to prescribed procedures (that ordinarily but not necessarily include an examination by a qualified professional). Such detention of an individual who is the subject of a mental hygiene petition, prior to a determination of probable cause, is authorized at *W. Va.Code*, 27-5-2(e) [2003].[56]

In the instant case, the petitioners assert that the respondent mental hygiene commissioners are clearly exceeding their lawful powers by ordering, prior to a probable cause determination, that an individual who is the subject of a mental hygiene petition is to be transported to and detained at one of the State's two acute care mental health hospitals, Sharpe Hospital and Bateman Hospital—which are operated by the petitioners.

In addition to mental hygiene commissioners, circuit judges and designated magistrates also have the authority to issue detention orders in individual mental hygiene cases. It is not specifically alleged that any of the individual orders complained of in the

---

1. The record is not clear as to the exact number of counties where the complained-of practice is actually occurring. Given our resolution of the issues raised in the petition, it is not necessary to make a definitive determination on this issue.

2. Mental hygiene laws address the civil commitment of persons due to mental illness and due to addiction. The statutory scheme is essentially the same for both categories. Although our discussion in this opinion focuses in some instances on mental illness-specific issues, our ultimate conclusions are generally applicable to cases involving addiction.

3. The "likely to cause serious harm" standard used in mental hygiene probable cause determinations is defined at *W.Va.Code*, 27-1-12 [2001]. In 2001, the Legislature added language to *W.Va Code* 27-5-1(5) [2001] stating that court action in a mental hygiene case is authorized when an individual is likely to experience serious and harmful physical or mental debilitation in the reasonably foreseeable future unless adequate treatment is afforded. *Id.* In *State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 439, 202 S.E.2d 109, 124 (1974) this Court held that the *parens patriae* power permitted court-ordered treatment for mental illness for other than direct physical injuries "if the type of injury were definitely ascertainable, and if the State had a treatment program which it could be demonstrated offered a reasonable likelihood of ameliorating the illness

or condition." *Id.* The Syllabus of *Hatcher v. Wachtel*, 165 W.Va. 489, 269 S.E.2d 849 (1980) states that the harm to be averted in a mental hygiene proceeding need not be imminent, nor need the likelihood of the harm be certain beyond a reasonable doubt. Rather, there must be a substantial risk of the harm or harmful conduct occurring within the reasonably foreseeable future. *Id. See O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (a state cannot confine mentally ill individuals absent dangerousness to self or others, inability to live safely on one's own, or other compelling circumstance justifying confinement.) *See* Behnke, Stephen H., *"O'Connor v. Donaldson, Retelling a Classic and Finding Some Revisionist History"*, 27 *J. Am. Acad. Psychiatry and Law* 115 (1999).

4. Circuit judges and some magistrates also can exercise authority in the mental hygiene system.

5. In the field, such detention orders upon information are currently referred to as "pickup orders" or "custody orders," in part to distinguish them from a discontinued type of magistrate-issued individual detention order; *see* note 15 *infra*.

6. The relevant language of *W. Va.Code*, 27-5-2(e) [2003] appears in the body of this opinion when we discuss this section in detail.

instant case were issued by circuit judges or designated magistrates.

However, in at least one judicial circuit involved in the instant case, a circuit judge has issued a standing order under *W. Va. Code,* 27–5–2(e) [2003]. The order designates a state psychiatric hospital as an approved detainee placement program detention facility, and generally authorizes pre-probable cause detention at that hospital. Apparently a number of orders sending an individual to a state hospital were issued as a matter of general practice by mental hygiene commissioners relying on that standing order. The details of the individual orders that underlie the instant case are not important to our decision. We will direct our discussion to the fundamental issue of the mental hygiene system's use of state psychiatric hospitals for court-ordered pre-probable cause detention.[7]

Specifically, the petitioners argue that the respondents do not have the power to order detention at Sharpe or Bateman Hospitals because those hospitals are not located within the jurisdiction of the circuit court where the mental hygiene commissioner is serving. The petitioners also allege that Bateman and Sharpe Hospitals are ordinarily operating at or above 100% of their licensed capacities, and that as a result of the respondents' detention orders, petitioners frequently must divert other patients to private hospitals—at a cost of nearly $3.5 million in Fiscal Year 2004. Petitioners say that 582 persons were ordered by mental hygiene commissioners to be transported to Sharpe and Bateman in FY 2004 for pre-probable cause detention.

Petitioners say that the direct cost to petitioners for patient diversion as a result of these detentions has been high in part because private hospitals will not take detained persons who have not been committed following a probable cause de-termination. Because they cannot divert detainees, petitioners say, other patients who have been committed must be diverted—and as a practical matter, the diverted patients' stays in private hospitals often must be for several days, at high rates.

The petitioners also say—and the respondents do not dispute—that for legal, professional, and practical reasons, petitioners are substantially limited in their ability to initiate appropriate medical treatment for such detainees.

We continue our discussion of the specific issues that are raised by the petitioners, and our resolution of those issues, in Part III. *infra,* after a review of the legal and factual context in which the issues arise.

## II.

### *Standard of Review*

■ This is an original jurisdiction proceeding in prohibition in which this Court acts *de novo.* "A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code,* 53–1–1." Syllabus Point 2, *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 233 S.E.2d 425 (1977). The relatively few facts that form the basis of our resolution of the instant case appear to be uncontested; the issues are ones of law relating to the powers of the circuit courts in mental hygiene cases.[8]

## III.

### *Discussion*

### A.

### *A Statutory Scheme in Flux*

■ In order to resolve the issues in the instant case, it must first be recognized that

7. The petitioners point out that as well as the circuit courts (and circuit clerks) and the petitioners (and law enforcement and other health entities)—the counties themselves have substantial involvement in and responsibility for the operation of the mental hygiene system. *See, e.g., W.Va.Code,* 27–5–4(r) [2001] (counties pay for certain mental hygiene expert witness and other hearing costs). The petitioners suggest that some detention costs may be the counties' re-sponsibility. The counties are not parties and no opinion is expressed herein on that issue.

8. "A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code,* 53–1–1." Syllabus Point 2, *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 233 S.E.2d 425 (1977).

Article 5 of Chapter 27 (*W. Va.Code*, 27–5–1 through 27–5–11), which principally specifies the procedures and standards to be used by courts and other participants in the execution and application of West Virginia's mental hygiene laws with respect to civil commitment due to mental illness and addiction, is in a state of flux.

Since Chapter 27, Article 5 was first enacted in 1965, there have been many changes in the language of the statute.[9] In that same time period, there have been very substantial, almost polar changes in the scientific understanding and treatment of mental illness.[10] It appears upon a full reading of Article 5 that there has been a good bit of "tinkering" with the statutory scheme—to try to remain concurrent with changes in medical practice, etc. But the basic structure of the statutory scheme has not changed in thirty years. As a result of the many and diverse statutory language changes over the years, Chapter 27, Article 5 has become a rather complex—and even sometimes confusing—statute.

The West Virginia Legislature has clearly manifested its awareness of the problems in the mental hygiene system and in its governing statutes, and of the need for improvement and change.[11] In 2002, the Legislature at *W. Va.Code*, 27–5–2(i) [2002] required that:

The supreme court of appeals and the secretary of the department of health and human resources shall collect data and report to the Legislature at its regular annual sessions in two thousand three and two thousand four of the effects of the changes made in the mental hygiene judicial process along with any recommendations which they may deem proper for further revision or implementation in order to improve the administration and functioning of the mental hygiene system utilized in this state, to serve the ends of due process and justice in accordance with the rights and privileges guaranteed to all citizens, to promote a more effective, humane and efficient system and to promote the development of good mental health. The supreme court of appeals and the secretary of the department of health and human resources shall specifically develop and propose a statewide system for evaluation and adjudication of mental hygiene petitions which shall include payment schedules and recommendations regarding funding sources.[12]

Thereafter, in April of 2005, the Legislature enacted *W. Va.Code*, 27–5–11 [2005] (this section is too long to include in this opinion), which requires this Court to implement modified mental hygiene procedures in four to six judicial circuits for four years and to report to the Legislature on the results of implementing the modified procedures.[13]

---

9. *Michie's West Virginia Code Annotated* lists amending changes, insertions, and provisos in 1966, 1974, 1975, 1977, 1978, 1979, 1980, 1981, 1983, 1992, 1993, 2001, 2002, 2003, 2004, and 2005.

10. *See* endnote 1.

11. In addition to stresses on the mental hygiene system from changing treatment modalities, the overall need for effective services relating to severe mental illness has drastically increased in recent years. *See generally*, Scott Finn, "Brother's Keeper—West Virginia's Mental Health Crisis", *Charleston Gazette*, January 2—February 13, 2002, *http://wvgazette.com/section/Series/Brother's+Keeper* ("In 2003, West Virginia's hospitals spent $101 million treating psychosis, more than any other illness. The number of people being committed to state psychiatric hospitals has jumped by 45 percent in just four years. Record numbers of state residents are committing suicide. Is the state failing the estimated 50,000 West Virginians with severe mental illness?").

12. Reports were made pursuant to this section, but it is not necessary to our decision to set out the details of those reports.

13. *W. Va.Code*, 27–5–11 [2005] specifically authorizes and sets standards for the issuance of medication and treatment compliance orders, and allows for temporary probable cause determinations to be made in some instances by an approved medical professional, and/or without a prior hearing before a judicial officer. Earlier-enacted statutory language *W.Va.Code*, 27–5–4(o), [2001], less specific than the newly-enacted language of *W.Va.Code*, 27–5–11 [2005], authorizes circuit courts in a final commitment to commit individuals to the care of a responsible individual or to a community-based mental health facility's treatment program. *Cf. Hatcher v. Wachtel*, 165 W.Va. 489, 493, 269 S.E.2d 849, 852 (1980) ("The possibility that Hatcher be committed to Shawnee Hills as an out-patient was mentioned, but no witness testified that this was a present viable alternative.") *See W. Va.Code*, 27–1–9 [1997] ("'Mental health facility' means any inpa-

Thus, there is ample evidence suggesting that in addressing the issues raised in the petition in the instant case, this Court is sailing in waters where more change in the future is quite likely. Put another way: in the instant case this Court is not elaborating on the details of a stable and fixed system. Our ruling in the instant case, rather, is a step in the evolution of a mental hygiene system that is faithful to constitutional principle and purpose, clear and well-defined in statute and regulation, and complementary to and current with the best practices and practical realities of modern science and medicine. To that end we direct our analysis.

### B.

### *The Issue at Hand*

We turn now to the petitioners' contention that the pre-probable cause detention of individuals at the state hospitals operated by the petitioners—especially as a general practice in a judicial circuit—exceeds the lawful powers of the respondent mental hygiene commissioners.

*W.Va.Code,* 27–5–2(e) [2003] states, in pertinent part, that

> The circuit court, mental hygiene commissioner or designated magistrate may enter an order for the individual named in the application to be *detained* and taken into custody for the purpose of holding a probable cause hearing as provided for in subsection (g) of this section [and] [14] for the purpose of an examination of the indi-

vidual by a physician, psychologist, a licensed independent clinical social worker practicing in compliance with article thirty, chapter thirty of this code or advanced nurse practitioner with psychiatric certification practicing in compliance with article seven of said chapter ... The examination is to be provided or arranged by a community mental health center designated by the secretary of the department of health and human resources to serve the county in which the action takes place. The order is to specify that the hearing be held forthwith and is to provide for the appointment of counsel for the individual: Provided, however, That the order may allow the hearing to be held up to twenty-four hours after the person to be examined is taken into custody rather than forthwith *if the circuit court of the county in which the person is found has previously entered a standing order which establishes within that jurisdiction a program for placement of persons awaiting a hearing which assures the safety and humane treatment of [such] persons:* [sic] .... [emphasis added]

*W.Va.Code,* 27–5–2(e) [2003] thus states that a "detain and take into custody" order shall require that there be a "forthwith" probable cause hearing. But this language is subject to the proviso that is at the heart of the instant case:

> Provided, however, That the order may allow the hearing to be held up to twenty-four hours after the person to be examined is taken into custody rather than forthwith

tient, residential or outpatient facility for the care and treatment of the mentally ill ..."); *see also* W. Va. Op. Atty. Gen. 122, May 29, 1981 ("After making the findings required by *Code* 27–5–4(j), the circuit court or mental hygiene commissioner may commit an individual to an outpatient program."). *See also* Geller & Stanley, "Settling the Doubts about the Constitutionality of Outpatient Commitment," 31 *New Eng. J. on Crim. & Civ. Confinement* 127 (2005). *See also* Winick, Kress, Cornwell and Deeney, "Exposing the Myths Surrounding Preventive Outpatient Commitment for Individuals with Chronic Mental Illness," 9 *Psychol., Pub. Pol'y, and L.* 209 (2003) (court-ordered "preventive outpatient commitment" has consistently been held not to offend due process and has consistently demonstrated positive results). *See also* Winick, Kress, and Hiday, "Outpatient Commitment, The State of Empirical Research on its Outcomes," 9 *Psychol., Publ. Pol'y,*

*and L.* 8, 22 (March/June 2003) ("It seems that mandatory treatment in the community permits development of stability and a trusting clinical relationship that persist beyond the active time of court orders (references omitted))." *See also In the Matter of K.L.,* 1 N.Y.3d 362, 806 N.E.2d 480, 774 N.Y.S.2d 472 (2004) (New York's "Kendra's Law," authorizing outpatient treatment orders for patients who have a mental illness and a history of treatment noncompliance and consequent relapse and deterioration that is likely to result in serious harm to the patient or others, is constitutional).

14. The word "and" is supplied here to make sense of the statute. The word "such" is supplied at the last line of the quoted language for the same reason.

*if the circuit court of the county in which the person is found has previously entered a standing order which establishes within that jurisdiction a program for placement of persons awaiting a hearing which assures the safety and humane treatment of [such] persons:*

■ In a mental illness probable cause determination, the central issue is whether there is probable cause to believe that an individual is "likely to cause serious harm" due to a mental illness. If so, the individual may be committed to a state hospital for (currently) up to thirty days examination and treatment. *See* Syllabus Point 11, *Riffe v. Armstrong*, 197 W.Va. 626, 477 S.E.2d 535 (1996). Currently, a "final commitment" petition must be filed within fifteen days of the probable cause admission, *W.Va.Code*, 27–5–3(g) [2003]. (As discussed at endnote 1 *infra*, while final commitments are not obsolete, changing medical realities have made hospitalization and treatment under a probable cause determination the modality of custodial treatment in more than 90% of mental hygiene cases.)

*W. Va.Code*, 27–5–2(e) [2003] is not the only statutory section addressing detention in connection with mental hygiene proceedings. *W. Va.Code*, 27–5–3(b) [2003] states that if a person is taken into custody and detained for purposes of a probable cause determination, and the medical examination upon which probable cause may be found "does not take place within three days from the date the individual is taken into custody, the individual shall be released." This

"three-day" language in *W.Va.Code*, 27–5–3(b) [2003] is somewhat inconsistent with the above-quoted language of *W. Va.Code*, 27–5–2(e) [2003].

Additionally, *W. Va.Code*, 27–1–14 [1979] states that:

"Detained or taken into custody" where used in this chapter shall permit detention for custody in a county facility which may be in the same building as the county jail if the said county facility:

(a) Meets the standards which the department of health shall prescribe; and

(b) Is approved for such use by the department of health; and

(c) Is inspected annually by the department of health.

While the record is silent on this issue, it may be surmised from the briefs submitted in the instant case that the language in *W. Va.Code*, 27–1–14 [1979] permitting detention in health department-approved county facilities is probably a "dead letter"—that is, that no such approved facilities exist. However, this language does show that the Legislature contemplated (in 1979) the detention of individuals in some instances in safe and approved local facilities prior to a probable cause determination.[15]

In 1922, in *Vineyard v. Roane County Court*, 92 W.Va. 51, 56, 114 S.E. 380, 382 (1922), this Court spoke directly to the construction of the term "forthwith:"

As applied to public officers this term ["forthwith"] has usually been construed to

---

**15.** Such legal and practical discrepancies are not surprising in a statute that has been so frequently amended, *see* note 5 *supra*. One of the prior versions of *W. Va.Code*, 27–5–2 [1992] provided that when a mental hygiene petition was filed, any magistrate could order an individual's detention for up to 24 hours if no circuit judge or mental hygiene commissioner was available to review the petition when it was filed—to allow the petition to be reviewed by a circuit judge or commissioner, who could order an examination and a probable cause hearing—which hearing could be then be held before a magistrate specially designated by the circuit court, a mental hygiene commissioner, or a circuit judge. *Id.* In *State ex rel. White v. Todt*, 197 W.Va. 334, 340, 475 S.E.2d 426, 432 (1996), this provision was stated in *dicta* to mean that "within twenty-four hours of being initially detained, a person who is

alleged to need involuntary civil commitment must be taken before a mental hygiene commissioner, magistrate, or circuit court judge for a probable cause hearing. *See W. Va.Code*, 27–5–2(b)(4) and (5) [1992]." *W. Va.Code*, 27–5–2(b)(4) and (5) [1992] in fact stated that the twenty-four-hour limit applied to the period of detention before the petition's presentation to a circuit judge or mental hygiene commissioner. The time "limit" on the occurrence of the probable cause hearing itself, according to the statute, remained "forthwith." *W. Va.Code*, 27–5–2(b)(4) [1992]. Subsequently the statute was amended to remove the mention of a pre-presentation detention period. The amended statute gave specially designated magistrates in some instances authority like that exercised by judges and commissioners. *W. Va.Code*, 27–5–2 [2003] reflects this change.

mean within a reasonable time, in the reasonable course of the orderly conduct of the business of the office, with all reasonable dispatch, but always to be manifested by the circumstances and the nature of the duty to be performed. [citations omitted].[16]

■ Thus, the term "forthwith"—a term that has persisted through the statutory history of West Virginia's mental hygiene scheme as controlling the timing of the occurrence of a probable cause determination— is a term whose definition in a given situation involving a public official must be determined "by the circumstances and the nature of the duty to be performed." [17] *Id.*

In this regard, the discussion in endnote 1 *infra* of the statutory scheme as it interfaces with changing practices in the area of mental illness treatment must be regarded as an important circumstance. Additionally, the definition of "forthwith" supplied by *Vineyard, supra,* specifically says that another important circumstance to be considered is "the nature of the duty to be performed." *Id.*

Syllabus Point 1 of *Citizens Concerned About Valley Mental Health v. Hansbarger,* 172 W.Va. 519, 309 S.E.2d 17 (1983) states:

[The West Virginia] Department of Health through its Board of Health and Director has [a] duty to insure [the] effective delivery of mental health services [in this State]. *W. Va.Code,* 16-1-1 [1977].

Also, Syllabus Point 2 of *E.H. v. Matin,* 168 W.Va. 248, 284 S.E.2d 232 (1981) states:

*W. Va.Code,* 27-5-9 [1977] requires a system of custody and treatment in State mental hospitals which reflects the competent application of current, available scientific knowledge.

■ Pursuant to these Syllabus Points, the petitioners have the general duty to assure the most effective and timely treatment reasonably possible for persons who are likely to cause serious harm due to mental illness—consistent with legislative and constitutional requirements.[18]

Another important circumstance is the particular nature of the due process that is involved in mental hygiene cases. In 1996, in *State ex rel. White v. Todt,* 197 W.Va. 334, 340, 475 S.E.2d 426, 432 (1996),[19] Justice Thomas McHugh wrote an instructive discussion of this issue, from which we quote in a footnote.[20]

---

16. *See State v. Pachesa,* 102 W.Va. 607, 135 S.E. 908 (1926) (fifty-day delay in executing "forthwith" search warrant was unnecessarily long); *see also State v. Ellsworth,* 175 W.Va. 64, 331 S.E.2d 503 (1985) (where one statute calls for an "immediate" detention hearing for an arrested juvenile, "forthwith" language reinforces need for holding a hearing before a magistrate with no delay); *see also State Auto. Mut. Ins. Co. v. Youler,* 183 W.Va. 556, 561, 396 S.E.2d 737, 742 (1990) ("forthwith" means a reasonable period of time for an insurance policy notice).

17. "It appears that West Virginia is [in 2000] the only state in the nation that requires a 'forthwith' hearing [in all probable cause determinations]...." *Report of the 1999 Supreme Court Mental Hygiene Reform Commission,* p. 26. "Every other state has a more decriminalized, less arduous and legalistic procedure. All other states make the initial hospitalization procedure much more of a medical decision." *Id. See, e.g., Project Release v. Prevost,* 722 F.2d 960 (2d Cir. 1983) (New York State statute authorizing physician to order seventy-two hour hospitalization, with a hearing within five days of demand, meets due process requirements).

18. The events leading to a mental hygiene commitment to a psychiatric hospital are dangerous, traumatic, and frightening. Every mental hygiene "pickup order" is an occasion of heightened risk for law enforcement. A mental hygiene commitment is not a "tune-up." It is a crisis situation—for the ill person, for their family and loved ones, and for all of the other participants in the process.

19. In *Todt,* this Court held that a detained potentially dangerous or dangerous escaped mental patient from another state had a right to be promptly afforded the opportunity to request a post-detention hearing to challenge his or her identification; but that the hearing did not have to be before a judicial officer.

20.
Due process is succinctly stated in article III, § 10 of the West Virginia Constitution: "No person shall be deprived of life, liberty, or property, without due process of law, and judgment of his peers." We note that
[w]hen due process applies, it must be determined what process is due and consideration of what procedures due process may require under a given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been impaired by government action.

Let us now attempt to bring together the various threads of the foregoing discussion and focus on the specific statutory language and issue to which the petitioners direct us.

*W.Va.Code*, 27–5–2(e) [2003] authorizes circuit courts to issue a "standing order which establishes *within that jurisdiction* a program for placement of persons [in detention status]." (Emphasis added). By "establish," we understand the statute to mean "designate and approve".[21]

Syl. pt. 2, *Bone v. W. Va. Dept. of Corrections*, 163 W.Va. 253, 255 S.E.2d 919 (1979).

Clearly, committing a person to a mental health facility involves a loss of liberty which implicates the due process clause. Indeed, the Supreme Court of the United States has noted: "This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330–31 (1979). *See, e.g., Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady*, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); and *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). *See also State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 435, 202 S.E.2d 109, 122 (1974) (An adjudication of insanity is a partial deprivation of liberty).

\* \* \*

Because of the adverse impact an involuntary commitment may have on a person, the due process procedures found in *W. Va.Code*, 27–5–1, *et seq.* are very important. Equally important, however,

[t]he State has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.
*Addington*, 441 U.S. at 426, 99 S.Ct. at 1809, 60 L.Ed.2d at 331.

Thus, although like a criminal defendant, a person facing involuntary civil commitment is faced with losing significant liberty interests, the reason behind taking away the mentally ill person's liberty is very different. Therefore, the two situations warrant different due process protections: "In a civil commitment state power is not exercised in a punitive sense.... [Indeed,] a civil commitment proceeding can in no sense be equated to a criminal prosecution." *Id.* at 428, 99 S.Ct. at 1810, 60 L.Ed.2d at 332 (footnote omitted). *See also Allen v. Illinois*, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (Due process does not require that a person be afforded protection against self-incrimination under the Illinois Sexually Dangerous Persons Act because the purpose of the act is for treatment rather than punishment). As the Supreme Court of the United States has more fully explained:

[T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.
*Addington*, 441 U.S. at 429, 99 S.Ct. at 1811, 60 L.Ed.2d at 333 (emphasis provided).

Furthermore, the Supreme Court of the United States has noted that the state's focus when dealing with a mentally ill person is much different than its focus when dealing with a criminal defendant:

It may be true that an erroneous commitment is sometimes as undesirable as an erroneous conviction, 5 J. Wigmore, Evidence § 1400 (Chadbourn rev.1974). However, even though an erroneous confinement should be avoided in the first instance, the layers of professional review and observation of the patient's condition, and the concern of family and friends generally will provide continuous opportunities for an erroneous commitment to be corrected. Moreover, it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty. *One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma .... It cannot be said, therefore, that it is much better for a mentally ill person to 'go free' than for a mentally normal person to be committed.* [emphasis added.]
*Id.* at 428–29, 99 S.Ct. at 1810–11, 60 L.Ed.2d at 332–33. Therefore, the due process protection afforded to a mentally ill person must be tailored to meet the unique circumstances of protecting him or her while at the same time protecting society. *Cf. Bone v. W. Va. Dept. of Corrections*, 163 W.Va. 253, 259–60, 255 S.E.2d 919, 922 (1979) (" '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).").
*State ex rel. White v. Todt*, 197 W.Va. 334, 340, 475 S.E.2d 426, 432 (1996).,

21. Obviously, the circuit court itself cannot, strictly speaking, "establish"—that is, create, operate, and/or staff—a detainee placement program or facilities, any more than the court can run a domestic violence shelter. Those are not judicial functions.

There are at least two possible readings of the phrase "within that jurisdiction." One possible reading—the one preferred by respondents—is that for petitions that are filed "within the circuit court's jurisdiction," the circuit court can designate and approve a detention placement program that is not necessarily located within the court's geographic jurisdiction. Another possible reading, preferred by the petitioners, is to read the phrase "within that jurisdiction" as modifying the term "placement program." This reading would (at least aspirationally) limit the location of the detainee placement program to the geographic boundaries of the judicial circuit.

Both readings are grammatically plausible. One piece of practical reasoning tends to favor the second reading. If the phrase "within that jurisdiction" does not at the least express a preference for a program of placement of detainees locally, the circuit courts could arguably without limitation designate one or both of the state's acute care psychiatric state hospitals as holding facilities for all individuals for whom there has been no probable cause determination. But there is no other language in the mental hygiene statutes suggesting that the Legislature intended the state hospitals to play a principal part in filling such a role. *W.Va. Code*, 27–1–14 [1979], discussed *supra*, contemplates detention in a county facility.

In any event, the somewhat ambiguous language in *W.Va.Code*, 27–5–2(e) [2003] is not, taken alone, clear or emphatic enough to ground a decision on the requested writ of prohibition in the instant case. Other relevant general principles of law and applicable facts from the foregoing discussion must also be taken into consideration as well.

■ From such consideration, it can be fairly concluded that both currently and consistently over the years, a central tenet of West Virginia's mental hygiene system has been that detaining and holding a person in custody without some sort of probable cause determination should occur for as short a period of time as is reasonably possible under all of the circumstances. This conclusion is supported by the statutes, and by the legal principles set forth in the foregoing discussion of due process and in an individual's right to treatment. Simply put, individuals for whom there is no probable cause should be released as soon as reasonably possible, and not held in detention. And, also as soon as reasonably possible, individuals for whom there *is* probable cause should receive needed treatment, not simply be held in detention.[22]

There are options that can help minimize the use and duration of pre-probable cause detention. Forthwith hearings whenever possible are preferred by *W.Va.Code*, 27–5–2 [2003]. Newly-enacted statutory measures seek to facilitate prompt probable cause determinations, *see W.Va.Code*, 27–5–11 [2005]. Hearings can be held by designated magistrates. *W.Va.Code*, 27–5–2(e) [2003]. Video-conferencing technology can be used, as well as cross-jurisdiction proceedings. *W.Va. Code*, 27–5–1(b)(2) [2002]. These options should be used whenever possible.

■ Although the issue is not squarely presented by the instant case, it is clear that the petitioners have a duty to work with the community health centers, other care providers, and local officials, including law enforcement and public health officials, to assure access to appropriate detention placement programs and facilities when they are necessary in the mental hygiene context.[23]

And at the current juncture, as a practical matter and in the absence of other alternatives, such a facility in an individual case may have to be (but need not be, of course) a state psychiatric hospital.

---

**22.** As discussed *supra, see State ex rel. Hawks v. Lazaro*, 157 W.Va. 417, 437, 202 S.E.2d 109, 123 (1974), effective treatment is one of the principal legitimate purposes justifying a person's being taken into in custody; and most custodial treatment of mental illness occurs during period of probable cause-based custody, not pursuant to a final commitment order.

**23.** There are also options for providing for local detention facilities—and if despite all other options a need for such a facility is regularly necessary in a circuit, then it would appear (but we do not decide) that local and state authorities have the responsibility to create local or regional detention facilities, where practical.

The instant case is similar in some ways to a prison overcrowding case, *see, e.g., State ex rel. Stull v. Davis,* 203 W.Va. 405, 508 S.E.2d 122 (1998)—competing statutory and constitutional provisions, and competing economic and political realities. In the instant case, also, the substantial variation in available treatment and judicial resources in different parts of West Virginia makes any "one-size-fits-all" prescription by this Court a problematic exercise.

In such cases, courts can try to address the specific problems, but also can enunciate principles and guidelines to guide the parties in negotiating and implementing future measures that will move the situation on the ground in the proper direction. If the parties, so guided, cannot resolve their differences without further court action, they can return to court—where the party that seems to be the most energetic and reasonable generally has a better chance of prevailing. *Compare State ex rel. McGraw v. Burton,* 212 W.Va. 23, 569 S.E.2d 99 (2002).

### IV.

### *Conclusion*

 Based on the foregoing reasoning, we hold that under the provisions of *W.Va. Code,* 27–5–2 [2003], the circuit courts (including the mental hygiene commissioners in a circuit) must conduct mental hygiene procedures in a way that minimizes the detention of individuals who are the subject of a mental hygiene petition prior to a determination of probable cause.

 We also hold that *W.Va.Code,* 27–5–2(e) [2003] does not authorize the circuit courts to issue a standing order that generally authorizes the pre-probable cause detention at a state psychiatric hospital of individuals who are the subjects of mental hygiene petitions filed within the circuit, without the exhaustion of other alternatives and a specific and compelling reason being shown in an individual case for requiring such detention at a state hospital. A circuit court, after consultation with the department of health and human resources, county officials and local law enforcement, and the community mental health center(s) serving the circuit's geographic area, may enter a standing order pursuant to *W.Va.Code,* 27–5–2(e) [2003] that provides that where, after a review of all other alternatives in an individual case, it is determined that no other option than detention at a state psychiatric hospital is reasonably feasible, such detention may be ordered in an individual case under reasonable terms and conditions.

The writ of prohibition is granted as moulded in accordance with the foregoing holdings.

Writ Granted as Moulded.

### ENDNOTE 1

Until the 1970s, the historic and recognized standard of medical treatment (often but not always court-ordered) for individuals who had persistent dangerousness to self or others as a result of serious chronic brain disorders like schizophrenia, depression, and mania—was long-term placement in a residential hospital—a facility that was originally called an "insane asylum." It should not be forgotten that the word "asylum" itself means a "place of safety." Until the development in the second half of the 20th Century of medicines that could significantly reduce self-destructive, suicidal, delusional, and violent conduct by persons with chronic brain disorders (and there are many such persons—the lifetime incidence of schizophrenia in the United States is one in one hundred persons), only safe and secure hospitalization confinement could protect most seriously ill mental patients, their families, and society in general. *See generally,* E. Fuller Torrey, M. D., *Out of the Shadows, Confronting America's Mental Illness Crisis,* John Wiley and Sons, 1997, pp. 13–42.

In 1972–73, West Virginia had 1,873 committed resident patients in state mental hospitals, and commitment to a state mental hospital in West Virginia meant an average stay of fifteen years. *State ex rel. Hawks v. Lazaro,* 157 W.Va. 417, 434, 202 S.E.2d 109, 121 (1974). Today West Virginia has about 200 non-forensic state psychiatric hospital beds; the average stay is less than fifteen

days, and many persons who are admitted due to dangerousness from mental illness are discharged within a few days after effective treatment with medication. *See* "Report of the 1999 West Virginia Supreme Court Commission on Mental Hygiene Reform," *http://www.state.wv.us/wvsca/mentalhyg/finalmh.pdf*, p. 6. (The virtual elimination of long-term residential facilities for the care of persons with severe mental illnesses is seen by some commentators as, at best, a mixed blessing. *See* Slovenko, Ralph, "Civil Commitment Laws, An Analysis and Critique," 17 T.M. Cooley L.Rev. 25, 50 (2000) ("The overall population of state psychiatric hospitals has been reduced from 552, 150 in 1955 to less than 80,000 today. [As a result, m]any of the seriously mentally ill now walk the streets or sit in jails. The reason is the virtual demise of public psychiatric hospitals as the caring and treating agency for individuals with debilitating mental illness ... it mocks our pretense of being a civilized nation."))

Today, for most patients, modern medications—if taken as prescribed (a big "if," see below)—can prevent many of the most dangerous symptoms of severe mental illness; can bring acute episodes of psychosis to an end in a relatively short time; and can reduce or often eliminate the need for hospitalization. However, many individuals with severe mental illnesses, as a result of their illness and through no fault of their own, have diminished insight into the need to adhere to a medication regime. Many experts feel that the most pressing current public health challenge in the area of mental illness treatment is obtaining better prescribed medication compliance by individuals with severe, chronic mental illnesses. *See generally*, "I'm Not Sick—I Don't Need Help: Helping the Seriously Mentally Ill Accept Treatment—a Practical Guide for Families and Therapists," Xavier F. Amador and Anna–Lica Johanson, Vida Press (2000). *See also State ex rel. Riley v. Rudloff*, 212 W.Va. 767, 782, 575 S.E.2d 377, 392 (2002) (Starch-

er, J., concurring). Discussing such individuals, the Supreme Court of Wisconsin recently said in *In Re Dennis H.*, 255 Wis.2d 359, 386, 647 N.W.2d 851, 863–864 (2002):

Moreover, by requiring dangerousness to be evidenced by a person's treatment history along with his or her recent acts or omissions, the fifth standard focuses on those who have been in treatment before and yet remain at risk of severe harm, i.e., those who are chronically mentally ill and drop out of therapy or discontinue medication, giving rise to a substantial probability of a deterioration in condition to the point of inability to function independently or control thoughts or actions. *See* Darold A. Treffert, "The MacArthur Coercion Studies: A Wisconsin Perspective," 82 *Marq. L.Rev.* 759, 780 (1999). The statute represents the fruition of the efforts of the Wisconsin State Medical Society and the Alliance for the Mentally Ill, professional organizations which recognized a need for a law that could be applied to those victims of mental illness who fell through the cracks under the old statutory scheme.

\* \* \*

By permitting intervention before a mentally ill person's condition becomes critical, the legislature has enabled the mental health treatment community to break the cycle associated with incapacity to choose medication or treatment, restore the person to a relatively even keel, prevent serious and potentially catastrophic harm, and ultimately reduce the amount of time spent in an institutional setting. This type of "prophylactic intervention" does not violate substantive due process.